UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

FRANK ARBOUR,                        )
                                     )
         Movant,                     )
                                     )
v.                                   )   Civil No. 7-26-B-W
                                     )   Crim. No. 2-73-B-W
UNITED STATES OF AMERICA,            )
                                     )
         Respondent                  )

**RECOMMENDED DECISION ON 28 U.S.C. § 2255 MOTION**

Frank Arbour, who is serving a 100-month sentence for federal controlled substance and

firearms offenses, has filed a 28 U.S.C § 2255 motion.  This case was stayed while Arbour had a

direct appeal pending in the First Circuit Court of Appeals.  The appeal is now final, see United

States v. Arbour, 559 F.3d 50 (2009), and I now recommend that the Court deny Arbour 28

U.S.C. § 2255 relief.[1]

*Discussion*

A.   *Factual Background*

The First Circuit Court of Appeals summarized the factual basis for Arbour's guilty plea

and sentencing, identifying the key players in Arbour's crime and prosecution, as follows:

> For a period of roughly eighteen months, Arbour trafficked in powder
> cocaine and crack cocaine in Maine. Arbour supplied a number of individuals

---

[1]      Arbour filed this petition on February 20, 2007.  In June, 2007, his right of direct appeal was reinstated
pursuant to an order of this court and the remainder of the petition was ordered stayed and held in abeyance.  (Doc.
No. 13).   On April 22, 2009, I entered an order lifting the stay and setting deadlines for the United States to answer
and Arbour to reply.  Arbour's copy of that order was returned to the court as undeliverable.  It had been mailed to
him at the Westchester Department of Corrections in Valhalla, New York.  The United States then obtained a series
of extensions, resulting in the answer ultimately being filed on September 2, 2009.  In mid-July 2009, after receiving
yet another piece of Arbour's mail returned as undeliverable, the court obtained a new address for Arbour from the
BOP's prisoner locator service.  Since July at least three pieces of mail have been sent to Arbour and not returned to
the court.  Additionally, the certificate of service on the United States' filings indicates it has also used the updated
address.  This court has received no communication from Arbour since his direct appeal was denied.  The Court of
Appeals' mandate was filed with this court in the criminal matter on April 7, 2009.

with drugs for purposes of both resale and consumption. Included among these individuals was Roy Dubreil, who sold both forms of cocaine to others, often from his home. At some point, Arbour moved in with Dubreil.

While Arbour was operating his drug trafficking business, he collected a number of firearms. Because he was a convicted felon, Arbour was prohibited from purchasing the firearms himself and therefore he enlisted three others to purchase the weapons for him. Two of these straw men, John Jackson and John Giannelli, were familiar to Arbour from his drug trafficking business. Jackson was one of Arbour's customers and also occasionally delivered drugs for Arbour. Giannelli frequently bought drugs from Dubreil. For their services in purchasing firearms for him, Arbour paid both Jackson and Giannelli with drugs. Arbour paid Baron Thompson, a third person he enlisted to purchase firearms, in cash.

The three ersatz buyers acquired a total of six firearms from a hardware store in Maine. Thompson alone purchased three firearms. Unable to purchase firearms himself because of his age, Jackson acquired two weapons indirectly, by enlisting a woman of age, Crystal Landry, to purchase the firearms for him. Arbour was directly involved in Giannelli's purchase from the hardware store, accompanying Giannelli to the store and discretely identifying the firearm he desired.

The firearms that Thompson, Jackson and Giannelli acquired for Arbour soon left Arbour's possession. Giannelli testified that, on the date of his purchase of the weapon, he witnessed a number of people from out of state arrive at Dubreil's home. According to Giannelli, the visitors supplied Arbour with drugs from Massachusetts, receiving money or "goods" in exchange. Giannelli observed the men going into a room with Arbour and Dubreil. Afterward, when Giannelli asked Dubreil where the firearm he had purchased for Arbour was, Dubreil told him that it was "already gone." Of the three weapons Thompson had purchased, two of them were discovered in the possession of a Massachusetts resident during a search of that person's home by law enforcement. That individual was also in the possession of seventy bags of cocaine. The firearms acquired by Jackson and Landry were never found, either in Arbour's possession or anywhere else.

Eventually, the authorities investigated Arbour's drug trafficking operation, ultimately searching Arbour's and Dubreil's residence. In Arbour's room, the police discovered bedroom scales, plastic baggies with cocaine residue, three firearms, and ammunition. In Dubreil's room the authorities found ten firearms and ammunition. Many of the firearms had been stolen, including the three firearms found in Arbour's bedroom. Arbour subsequently pled guilty to five drug and firearms related charges.

At Arbour's sentencing hearing, a number of witnesses testified about his drug trafficking business and acquisition of firearms. In addition to this testimony, defense counsel conceded at sentencing that Arbour had traded guns for cocaine on at least one occasion.

Arbour, 559 F.3d at 51 -52 (footnote omitted). Thompson, Jackson, Landry, and Giannelli were all convicted of various firearms offenses for their roles in these purchases. Id. at 52. n.1. Jackson and Giannelli testified at Arbour's March 14, 2005, sentencing hearing.

**B.     This 28 U.S.C. § 2255 Proceeding**

Arbour's 28 U.S.C. § 2255 grounds are as follows. First he charges counsel with ineffective assistance of counsel listing multiple shortfalls. Second, he asserts that this court improperly applied the sentencing guidelines when concluding that Arbour was an organizer per U.S.S.G. 3B1.1, the claim he raised in his reinstated direct appeal. Third, his due process rights were violated by prosecutorial misconduct. And fourth, Arbour faults this Court for making various other sentencing errors.

In my order recommending a stay of this proceeding while Arbour's reinstated direct appeal was pending I indicated: "Arbour's petition appears to contain certain grounds that could only be raised on direct appeal, but it also contains a broad claim of ineffective assistance of counsel that in all probability cannot be fully resolved on direct appeal." (Doc. No.12.) In my order lifting the stay I ordered the United States to respond to the portion of Arbour's § 2255 motion that was held in abeyance (Doc. No. 14) The United States has now answered.

The only cognizable 28 U.S.C. § 2255 claim remaining after the reinstatement and completion of Arbour's direct appeal is his multi-layered ineffective assistance ground. I can see no reason why this court can consider in a collateral review posture Arbour's claims concerning the Court's and the prosecution's conduct in light of the fact that Arbour obviously knew of these claims before his direct appeal was allowed to go forward and did not raise them in that direct appeal. See Sustache-Rivera v. United States, 221 F.3d 8, 17 (1st Cir. 2000); Knight v. United States, 37 F.3d 769, 772 -73 (1st Cir.1994); see also United States v. Pettiford, 101 F.3d 199,

202 (1ˢᵗ Cir. 1996) ("Exceptional circumstances may excuse a delayed making of a claim, <u>Knight v. United States</u>, 37 F.3d 769, 773 (1st Cir.1994), and ignorance may be a factor.").[2]

## C.   *Ineffective Assistance Standard and the Limits of 28 U.S.C. § 2255 Review*

The First Circuit summarized the standard for 28 U.S.C. § 2255 ineffective assistance claims in <u>United States v. De La Cruz</u>:

> The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect. <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 374 (1986). In order to prevail, a defendant must show both that counsel's representation fell below an objective standard of reasonableness and that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. <u>Strickland v. Washington</u>, 466 U.S. 668, 688, 694 (1984). In other words, a defendant must demonstrate both seriously-deficient performance on the part of his counsel and prejudice resulting there from.

514 F.3d 121, 140 (1st Cir. 2008).

"When a petition is brought under section 2255, the petitioner bears the burden of establishing the need for an evidentiary hearing." <u>United States v. McGill</u>, 11 F.3d 223, 225 (1st Cir.1993)(citations omitted).  "A district court may forego such a hearing when 'the movant's allegations, even if true, do not entitle him to relief, or ... [when] the movant's allegations "need not be accepted as true because they state conclusions instead of facts, contradict the record, or are inherently incredible." ' " <u>Owens v. United States</u>, 483 F.3d 48, 57 (1st Cir. 2007) (quoting <u>David v. United States</u>, 134 F.3d 470, 477 (1st Cir.1998)); <u>see also</u> <u>McGill</u>, 11 F.3d at 225 ("In determining whether the petitioner has carried the devoir of persuasion in this respect, the court must take many of petitioner's factual averments as true, but the court need not give weight to

---

[2]  The United States has covered its bases and provided a discussion as to why Arbour's non-ineffective-assistance claims are without merit.  If the Court decides to consider these in a § 2255 posture, the United States has provided adequate grounds for denying Arbour relief on those claims.

In its responsive memorandum the United States does characterize Arbour's third ground as being one of ineffective assistance of counsel.  This is rather a leap as it is clearly framed as one of prosecutorial misconduct and, if anything, it offers a basis for excusing any shortfalls on the part of defense counsel as a consequence of the alleged malfeasance of the prosecutor.

conclusory allegations…") (citations omitted).  Furthermore, when a "petition for federal habeas relief is presented to the judge who presided at the petitioner's trial, the judge is at liberty to employ the knowledge gleaned during previous proceedings and make findings based thereon without convening an additional hearing."  McGill, 11 F.3d at 225.

### D.    *Arbour's Ineffective Assistance of Counsel Claim*

With respect to his ineffective assistance of counsel claim Arbour articulates several areas of dissatisfaction with his attorney's performance.[3]

### 1.  Plea-related Sixth Amendment Claims

There are a handful of Arbour's Sixth Amendment § 2255 claims that relate to the guilty plea in his case.  Arbour faults his counsel for not adequately counseling him on the "[e]ffects and consequences" of his plea.  (Sec. § 2255 Mot. at 6.)  According to Arbour, his attorney informed him that his plea was a conditional plea that would allow him to appeal the suppression order and then later told him that he had decided against such an appeal. Arbour also maintains that his attorney "failed to notice major discrepancies in witness testimony and was not even vaguely familiar [with] what was testified to prior to [Arbour's] plea."  (Sec. 2255 Mot. at 6.) This seems to be a reference to the grand jury testimony.  Arbour relates that he had to fill his attorney in on the particularities of this prior testimony. Another § 2255 complaint with counsel is that he coerced Arbour into pleading guilty on all counts except Count 8, which was dismissed by the prosecution. Arbour relates: "He told my family and [me] that if  [I] took the case to trial the government would win on all counts and I would do nearly 20 years."  (Sec. 2255 Mot. at 8.) According to Arbour his attorney explained that his sentencing points would be 28 minus a three point reduction for acceptance of responsibility, at a Criminal History Category I.  In an additional Sixth Amendment volley Arbour states: "Ten (10) minutes before I pleaded guilty [my

---

[3]        All, but one, are unrelated to the failure to help him file his direct appeal.

attorney] had skimmed the facts of the government's version of the offense, I denied a few facts and we objected.  My attorney told me to answer the judge as I reviewed the document."  (Sec. 2255 Mot. at 9.)

I entered a recommended decision on Arbour's motion to suppress on May 2, 2003. After some initial confusion about Arbour's intent in pursuing the motion to suppress, the motion came up for a decision based, with the defense's consent, on the review of the affidavit submitted to the State of Maine judge in support of the premises search warrant.  United States v. Arbour, Crim. No. 02-73-B-W, 2003 WL 2012560, 1 (D.Me. May, 2, 2003) (recommended decision). With respect to probable cause I concluded:  "Given the degree of detail provided by the confidential informant based upon his obvious first hand knowledge and given the corroboration obtained through the recorded conversation, the issuing judge's probable cause determination is beyond reproach."  Id. at 2.  As for the manner of execution of the no-knock warrant, it "was executed sans the normal knock and announce procedures, based upon the executing officers' alleged fears for their safety and their concerns about the potential destruction of evidence."  Id. It was by conclusion as to this aspect of Arbour's challenge, that "the affiant articulated a sufficient reasonable suspicion regarding the potential for violence and/or the destruction of evidence to satisfy the constitutional requirement of reasonableness pursuant to governing First Circuit precedent."  Id. at 3 (citing United States v. Sargent, 319 F.3d 4, 9 (1st Cir.2003)). Arbour filed an objection to (Doc. No. 39) and this Court concurred with my recommendation after a de novo review.  United States v. Arbour, Crim. No. 02-73-B-W, 2003 WL 21396861, 1 (D. Me. June 17, 2003).

Arbour does not articulate in his 28 U.S.C. § 2255 motion what grounds he had for appealing the denial of his motion to suppress. He is not arguing that counsel was ineffective for

consenting to forgo an evidentiary hearing; he only faults counsel for not preserving his right to appeal this suppression order to the First Circuit.  It will come as no surprise that I conclude that there is no Strickland performance shortfall in counsel's conclusion that there would be no merit to such an appeal.  What is more, given the way in which Arbour's sentencing played out, with the prosecutor making a significant argument that Arbour should not have the advantage of an acceptance of responsibility reduction because of his unwillingness to fully concede certain factual predicates for sentencing findings (see Nov. 23, 2004, Partial Sentencing Tr. at 10-25; Mar. 14, 1005, Sentencing Tr. at 13, 17, 118-23, 130-31, 138-40, Doc. No. 161) in all likelihood counsel's acceptance of the finality of the suppression decision saved Arbour from further sentencing peril.

As for the failure to review grand jury testimony, Arbour himself states that he did fill his attorney in on the testimony he presumably felt relevant.  Therefore, even if counsel was in some way lax on this score, there is no Strickland prejudice.

## 2. Sentencing

In his § 2255 motion, Arbour opines that his attorney "was not prepared for sentencing as the case was postponed for an exceedingly length of time" as a result of defense and prosecution motions and, as a consequence, Arbour's attorney "lost all familiarity" with his case. (Sec. § 2255 Mot. at 5-6.)     He also insists that his attorney's performance was inadequate because of the failure to argue that enhancements to the sentence were really elements of the offense and he failed to argue that the findings made by this Court at sentencing violated Arbour's rights under Blakely v. Washington, 542 U.S. 296 (2004) and United States v. Booker, 543 U.S. 220 (2005). Arbour faults his attorney for not filing a Blakely/Booker motion during the fall of 2004.  Arbour

recognizes that he did file such a motion <u>pro</u> <u>se</u> and finds something amiss in the fact that this motion is not part of his file provided by his attorney.

The path from the change of plea to the sentencing was protracted, punctuated by the Supreme Court's <u>Blakely</u> and <u>Booker</u> decisions.  Arbour entered his plea on October 20, 2003. (Crim. No. 02-73-B-W, Doc. No. 53.)  The pre-sentence report (PSI) was prepared by December 5, 2003.  On December 17, 2003, Arbour's attorney filed a motion to extend time to file objections to the PSI in which it is represented that Arbour consented to excluding this time from his Speedy Trial time-frame. (Doc. No. 59.)  The PSI was revised on January 20, 2004.  A pre-sentence conference was held on February 25, 2004.  (Doc. No. 68.)  On April 27, 2004, a notice of hearing was entered setting Arbour's sentencing for June 28, 2004.  On May 12, 2004, Arbour's attorney filed a motion to continue the sentencing because Arbour's mother had prepaid plans to be out of the state during the sentencing and she wanted to support her son. (Doc. No. 71.)  Sentencing was reset for July 22, 2004. (Doc. No. 75.)

<u>Blakely</u> was decided on June 24, 2004.   On July 14 there was a conference of counsel in which the implication of <u>Blakely</u> for Arbour's case was addressed.  (Doc. No. 81.)[4]  In July 21,

---

[4]      Arbour's attorney articulated the defense position as follows:
>         I think that, when I go over the plea agreement and the objections I had to the prosecution's version, as well as the -- the challenge to the presentence report, I think that the main issue that is going to require an evidentiary hearing would be the issue of his being an organizer or leader of a criminal activity that involved five or more persons, and Dan -- Dan has brought in -- or as I understand from Dan, brought in some of the people who were allegedly involved with my client in the enter -- the socalled enterprise.
>         I think, as I reread it, the other issues that I raised are really legal questions, for instance, whether it's, you know, a crime of violence -- I know the First Circuit has ruled against it, but I would like to preserve that -- but, you know, a crime of vi -- whether or not a nonviolent burglary and to what extent do you go behind the record to take him out of that as a prior crime of violence. But that's argument.
>         Also, I made a challenge to paragraph 11 involving the number of guns, but I think that under <u>Blakely</u>, that his plea agreement to possession of those guns forecloses an evidentiary hearing on that matter. <u>Blakely</u> indicated – and I'm just saying this for the record -- that -- that if facts are contained within a plea agreement, then those can be taken into account by the judge. It's only where the plea agreement or a jury verdict doesn't encompass facts necessary for the increase.

2004, the defense filed another motion to continue because Arbour was ill and his doctor had

scheduled a battery of tests on July 22, 2004.  This motion also indicated that defense counsel

had a vacation scheduled from July 23 to August 9, 2004.  (Doc. No. 85.)   The court reset the

sentencing for August 10, 2004.  (Doc. No. 87.)  On August 4, 2004, the Court convened a

conference of counsel.  (Doc. No. 91.) The transcription of that conference reveals an exploration

of the implications of Blakely for Arbour's sentencing as it related to the potential of an

organizer/leader enhancement.  (Conference of Counsel Tr. at 2, Doc. No. 156.)  It was the

United States' position that Arbour's sentencing be deferred  until there was some clarification

from the United States Supreme Court as to how Blakely would apply to this question.  (Id. at 2-

5.)  Defense counsel pointed out that Arbour had been incarcerated at the Penobscot County Jail

since October 2003 and that this was a relative hardship compared to his impending incarceration

in a federal facility.  (Id. at 5-6.)  The Court settled on an extended briefing schedule of

approximately one month.  (Id. at 7-9.)   Counsel for Arbour submitted a brief regarding the

delay in sentencing on August 23, 2004.  (Doc. No. 93.)  Counsel cited Barker v. Wingo, 407

U.S. 514, 530 (1972) and its factors addressing the length of the delay, the reason for the delay,

the defendant's assertion of his right, and the prejudice to Arbour.  Counsel characterized the

prosecution's argument for delay as stemming from a "tactical quandary." (Def.'s Aug. 23, 2004,

Br. at 2.)  "Finally," counsel insisted, "Barker requires an analysis of the prejudice to the

defendant caused by the delay.  It is clear that the federal facilities provide much more in the way

of rehabilitation than a county jail."  (Id.)  Counsel asked the court to set the sentencing for a

date in the near future.  (Id.)  The Court entered an order stating that there was no Sixth

---

> So I think that the only issue that I would suggest that would be ripe for a jury trial [is]
> whether the – his position as an organizer or leader, and this is what I wanted to raise with the
> court.

(July 14, 2004, Tr. at 3-4, Doc. No. 155.)

Amendment violation at issue and ordered that a sentencing hearing be scheduled to comply with Federal Rule of Criminal Procedure 32(b).  (Doc. No. 94.)  A sentencing hearing was scheduled for October 25, 2004.  (Doc. No. 95.)   There was another motion for a continuance filed on behalf of Arbour (Doc. No. 99) and on November 23, 2004, the court convened a partial sentencing hearing (Doc. No. 104).   That hearing was continued after it became clear that there was an unresolved post-Blakely concern regarding the unresolved drug-quantity calculation involved and the implications of this issue apropos Arbour's eligibility for an acceptance of responsibility reduction. (See Nov. 23, 2004, Sentencing Tr., Doc. No. 146.)   Sentencing was rescheduled for January 18, 2005.  (Doc. No. 111.)

Booker was decided January 12, 2005.  On January 18, 2005, a conference of counsel was held and sentencing was rescheduled for February 18, 2005.  (Doc. Nos.  112 & 113.) Although before Booker the parties had conceived of an approach in which the prosecutor would introduce transcripts of grand jury testimony, the defense now wanted to cross-examine witnesses.  (Jan. 18, 2005, Tr. at 3-4.)   On February 16, 2005, Arbour's attorney filed another motion to continue (Doc. 120) which the Court granted, indicating: "The sentencing will be rescheduled to be held on March 14, 2005 at 9:00 A.M. No further continuances for any reason will be granted. Counsel shall be prepared to proceed with sentencing on 3/14/05 at 9:00 A.M." (Doc. No. 123.) Arbour's sentencing hearing was held on March 14, 2005.

Based on this record, there is no Strickland performance shortfall with respect to counsel's efforts to protect Arbour's interests in the aftermath of first Blakely and then Booker. It is also clear that this Court's approach to Arbour's sentencing did not run afoul of Booker.

Arbour also challenges his attorney for failing to argue that the U.S.S.G. § 3B1.1 sentencing enhancement requires that there be more than one person involved in the instant

offense to justify the leadership or organizer enhancement.  To the extent that Arbour still seeks

review of this claim in the aftermath of his direct appeal, this facet of Arbour's Sixth

Amendment claim is entirely frivolous.

In ruling on Arbour's direct appeal the First Circuit explained: "In order to invoke §

3B1.1(a), a district court must make a finding as to scope-that the criminal activity involved five

or more participants or was otherwise extensive-and a finding as to status-that the defendant

acted as an organizer and leader of the criminal activity."  Arbour, 559 F.3d at 53 (citing United

States v. Tejada-Beltran, 50 F.3d 105, 111 (1st Cir.1995))(footnote omitted).  The Panel

explained:

> For § 3B1.1(a) to apply, the criminal activity that the defendant led or
> organized must have involved five or more participants *or* been extensive. §
> 3B1.1(a). The disjunctive language of § 3B1.1(a) is important-a criminal activity
> may be extensive even if [it] does not involve five or more participants. Id. cmt. n.
> 3 ("In assessing whether [a criminal activity] is 'otherwise extensive,' all persons
> involved during the course of the entire offense are to be considered. Thus, a
> fraud that involved only three participants but used the unknowing services of
> many outsiders could be considered extensive."); see also United States v. Laboy,
> 351 F.3d 578, 585 n. 10 (1st Cir.2003) ("The 'five or more participants' and
> 'otherwise extensive' elements are alternative means of finding the required scope
> under § 3B1.1."); United States v. D'Andrea, 107 F.3d 949, 957 (1st Cir.1997)
> (citing Rostoff, 53 F.3d at 413).
>      In addition, a court may look beyond the specific crimes for which the
> defendant was convicted when determining whether the criminal activity satisfied
> the numerosity or extensiveness requirement. Laboy, 351 F.3d  585-86. The court
> may consider all "relevant conduct" surrounding the crimes of conviction. Id. at
> 586 (rejecting defendant's argument that the assessment was limited to the people
> directly involved in the three drug sales to which the defendant pled guilty when
> making the numerosity/extensiveness determination).
>      Here, the district court did not commit clear error when it found that
> Arbour was involved in a criminal activity that involved five or more participants
> or was otherwise extensive. Although the court found that Arbour's criminal
> activity met both the numerosity and extensiveness requirements of § 3B1.1(a),
> we focus on the extensiveness component.

Arbour, 559 F.3d at 53 -54.  "In light of the significant evidence of cross-pollination between

Arbour's drug and firearms dealings both in the form of overlapping goods and criminal

participants," the Panel ultimately reasoned, "we cannot conclude that the district court clearly erred in rejecting Arbour's attempt to compartmentalize his criminal activity into separate, unrelated clusters." Id. at 54-55.

With regards to Arbour's challenge on appeal as it relates to this § 2255 claim, the Panel also addressed an argument "that, even if he led or organized some people, he did not lead or organize the number of people required by § 3B1.1(a). The magic number, in Arbour's view, is five or more individuals." Id. at 55. It concluded:

> Regardless of whether the criminal activity involved five or more participants or was otherwise extensive, the guideline commentary makes plain that a defendant needs only to have led or organized *one* criminal participant, besides himself of course, to qualify as a leader or organizer under § 3B1.1(a). § 3B1.1(a), cmt. n. 2 ("To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor *of one or more other participants.*") (emphasis added). Nearly every circuit court has reached this same conclusion.

559 F.3d at 56 (collecting cases). This conclusion certainly deflates any argument by Arbour concerning Strickland prejudice. On top of that, it is fair to say with regards to the Strickland performance inquiry that the brunt of defense counsel's considerable efforts during the sentencing proceedings was aimed at avoiding the application of U.S.S.G. § 3B1.1(a).

Arbour also challenges to his attorney's performance by presenting a compound description of perceived shortfalls as to the presentation of defense evidence during sentencing. He articulates:

- Roy Dubreil was in Massachusetts on a "drug run" the night Arbour's cocaine was stolen
- The stories of Mr. Jackson had discrepancies too numerous to list.
-  Crystal Landry testified that Mr. Jackson always had money and that he was secretive
- Landry testified that she never met or knew Arbour
- Mr. Giannelli had discrepancies in his testimony such as he told the Grand Jury that he "never introduced" Arbour
- Giannelli tried to blame Arbour for the crimes that he committed/was convicted of

12

- Tim Clark was being investigated for trafficking cocaine and had connections to his home state of Massachusetts
- Dubreil, Clark, and Terry Oh, who all knew each other,  were mentioned more than Arbour at the sentencing hearing
- There was no substantiated proof that Arbour ever possessed certain guns as the guns were never found

There were, Arbour offers in a final conclusory salvo, "many more facts with which [Arbour's] lawyer did not investigate nor use in [his] defense."  (Sec. 2255 Mot. at 8.)

This aspect of Arbour's § 2255 Sixth Amendment claim does not warrant much discussion.  I note only as follows.  First, the March 14, 2005, sentencing transcripts bear witness to defense counsel's skilled cross-examination of Jackson and Giannelli.  He managed to elicit from them many answers that spoke to the witnesses' lack of first-hand knowledge concretely linking Arbour to the criminal conduct in question.  (Mar. 14, 2005, Sentencing Tr. at 29-30, 40-41, 87-89.)  Arbour's claim that other individuals came up by name more than he did in his sentencing is nonsensical. The proceeding was clearly focused on Arbour's conduct as it related to the sentencing factors to be determined and, of course, other names came up in this exploration of Arbour's responsibility as a leader/organizer.  The type of evidence that Arbour identifies in this sub-part of his claim would have been diversionary and palpably detrimental to the defense's position.  And, as to Arbour final assertion that there was no substantial proof linking Arbour to certain guns, as the discussion of the path to sentencing above well illustrates, such an argument by counsel would have no doubt negatively impacted this court's calculus apropos the acceptance of responsibility reductions.

### 3.  General Preparation

With respect to more generalized concerns about his attorney's performance, Arbour explains that his attorney took his case for a flat fee yet, a few months prior to sentencing, he took more money for a research group that was to research the enhancement issues and prepare a

13

brief thereon.   However, Arbour maintains that the record reveals that no research was conducted or brief written, despite the fact that counsel was paid this extra fee.  It is true that there appears to be no such brief presented to the Court prior to the March 14, 2004, sentencing.  However, whatever fee related claims Arbour might have against his attorney,[5]  with regards to a Sixth Amendment analysis I cannot see how such a brief could have possibly helped the defense given the level of advocacy on both sides and the Court's careful analysis of the issues raised by <u>Blakely</u> and <u>Booker</u>.  There is no <u>Strickland</u> deficiency with respect to performance or prejudice here.

        In addition, Arbour states that his attorney never listened to a tape of a wire-tapped conversation between Roy Dubreil, Jeff O'Neil, and Arbour. Upon review of his own file, Arbour discovered three or four copies of transcription of this tape and all except one had interlineated edit marks, initialized JR, who Arbour believes is MDEA officer John Richards. "These edit marks make it clear that the tape was less than audible."  (Sec. 2255 Mot. at 7.) Arbour further faults his attorney for never noticing that there was no information in the discovery pertaining to Mr. Giannelli or his guns.  This, coupled with the failure to explore the tapes, illustrates that his attorney was not putting an effort into fighting Arbour's case and did not adequately consult with him about possible viable defense issues.

        The only relevance that the tape and the transcription had to Arbour's case was at sentencing as Arbour is not now suggesting that the content of that taped conversation was somehow sufficiently exculpatory of his guilt to those crimes he confessed to in his plea hearing.

---

[5]        Arbour relates that ever since his sentencing to a set of state charges, counsel has refused to answer Arbour's correspondence or accept phone calls. Arbour represents that it took counsel from August 2005 until February 2006, to provide him with legal files and discovery, and even then the file was incomplete.  He expands, "it, suspiciously did not have any of the correspondence [Arbour] sent him nor any response[ive] letters, which pertained to the search warrant, witnesses and facts of the case that should have helped establish[] a defense to the case."  (Sec. 2255 Mem. at 6.)   This challenge does not go to the validity of his conviction or sentence.

Indeed, Arbour has failed to even explain to the court what the material significance of the edit marks/the lack of clarity was/is.  In a similar vein, Arbour suggests that there may have been some information not discovered about Giannelli and his guns but does not describe for the court what this information is and how counsel could have put it to use either prior to the plea or at sentencing.  With respect to sentencing and counsel's <u>Strickland</u> performance, I note that counsel demonstrated skilled advocacy in responding to what became a rather tricky situation when Giannelli took the stand and immediately informed the court that he did not feel comfortable giving testimony without an attorney present.  (Mar. 14, 2005, Sentencing Tr. at 49-53.) Arbour's attorney persistently cross-examined Giannelli once he was assisted by counsel, and pressed the court on the question of whether it was fair to consider any of his testimony in view of the witness's selective assertion of his Fifth Amendment privilege.  (<u>Id.</u> at 71-87.)[6]

### Conclusion

For the reasons above I recommend that the Court deny Arbour 28 U.S.C. § 2255 relief. I further recommend that a certificate of appealability should not issue in the event Arbour files a notice of appeal because there is no substantial showing of the denial of a constitutional right within the meaning of 28 U.S.C. § 2253(c)(2).

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

---

[6]     Arbour claims that his attorney did not adequately prepare a defense in response to judicial and prosecutorial misconduct. He maintains that the court allowed the prosecutor to "blindside the defense, withhold exculpatory evidence, and use false statements." This is a sub-part of Arbour's § 2255 claim that does not even warrant discussion given its entirely conclusory nature.  <u>Owens</u>, 483 F.3d at 57.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

October 23, 2009.